UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 10-208-DLB-CJS

JAMES DILLON DAWSON                                                    PLAINTIFF

VS.                        MEMORANDUM OPINION AND ORDER

JOHN DORMAN, ET AL.                                                   DEFENDANTS

* * * * * * * * * * * * * * *

Plaintiff James Dillon Dawson  initiated this § 1983 action against Defendants John Dorman, individually and in his official capacity as Ludlow City Police Officer, A. Wayne Turner, individually and in his official capacity as Ludlow City Chief of Police, and Benny Johnson, individually and in his official capacity, as Ludlow Assistant Police Chief, alleging constitutional violations of Plaintiff's Fourth, Eighth and Fourteenth Amendment rights. Against Defendants Turner and Johnson, Plaintiff also alleges state law claims of negligent hiring, retention and supervision.  The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. # 31).  The motion has been fully briefed (Docs. # 37, 39), and the matter is now ripe for review.  Upon review of the parties' written submissions, the Court finds that oral argument is not necessary.   For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. # 31) is hereby **GRANTED**.

1

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On August 19, 2009, a robbery was committed at 31 Ash Street, Ludlow, Kentucky, the home of Richard and Eva Morrow.  At approximately 1:00 a.m., a man wearing a gold hooded sweatshirt and a white bandana around his face entered the Morrow's home.  He held a gun to Eva's face and demanded money that was stored in a shoe box in a closet in her bedroom.  The robber stated that if Eva did not comply, he would shoot her and her children.  Eva, of course, complied, and led the man to the shoe box of money.  (*Id.*).  He took the money and ran out of the house.  Eva then called 911 and her husband, Richard, to report the robbery.

After the 911 call, several Ludlow police officers, including Defendant, Detective John Dorman, responded to 31 Ash Street.  Dorman spoke with both Eva and Richard Morrow, who had returned home after learning that his wife was robbed.  Eva explained what had happened and gave a description of the robber.  Although the man was wearing a white bandana over his face, Eva told Dorman that she was able to see the man's face through the bandana because of light from the closet where the shoe box was kept. Dorman presented Eva with a lineup of photographs, and Eva identified two photographs that she believed matched the burglar's description, one of which was Plaintiff Dawson. Later, she was presented with a second lineup, and she positively identified Dawson as the robber.

Richard Morrow told officers that he was not home during the robbery because he had previously arranged to meet Eric Baker, a social acquaintance and Dawson's step brother, to purchase marijuana.  Richard explained that he had just received a cash

settlement of $20,000.00 that day.  While Richard and Eva were at Cash Express earlier in the day, Richard ran into Baker and Dawson, who saw that Richard had a large amount of cash. Baker even made a comment that he better put the money in the bank before he gets robbed.  After their encounter, Baker and Dawson came to Richard's house several times that day, and, at some point, Baker made arrangements with Richard to buy marijuana from Baker's father in Latonia.  However, when Richard and his friend, Lucian Thomas, went to Latonia to purchase the marijuana, Baker never showed up for the transaction.  After waiting for awhile, Richard drove back to Ludlow and parked outside of Baker's home to look for him.  While they were sitting in the vehicle, Thomas observed Baker and another individual wearing blue jeans and a gold hooded sweatshirt run into Baker's home, which is about three blocks from the Morrow's home.  Moments later, Richard received a call about the robbery and headed back to his house.

After interviewing Richard and Eva, Sergeant Fred Roberts collected the shoe box which contained the stolen cash as evidence and dusted it for fingerprints.  Since Thomas stated that he saw Baker and a man matching the description of the robber run into Baker's home, the officers next went to Baker's house on Butler Street.  The owner of the house, Baker's father-in-law, consented to a search of the residence.  During the search, officers located a gold hooded sweatshirt, two glasses of water in Baker's room that contained ice that had not yet melted, and a soda can.  Baker's wife told officers that she had not seen the sweatshirt in a while but knew it belonged to one of Baker's brothers.  The sweatshirt, cups and soda can were seized as evidence.  Sergeant Roberts also collected fingerprints from one of the cups and the soda can.  Neither Baker or Dawson were at the residence by the time the officers arrived.

3

With the information gathered the day of the robbery, Dorman applied for a warrant for Dawson's arrest on August 21, 2009.  The application recited the facts related by Eva and Richard Morrow, but, because no fingerprint analysis had yet been conducted, did not mention the fingerprints obtained from the evidence at the Morrow or the Baker homes. The application also stated that Eva Morrow identified Dawson in a photo lineup as the robber.  Upon finding that the application was supported by probable cause, the Kenton District Court issued a warrant for Dawson's arrest that same day.

While officers were attempting to locate Dawson, the investigation continued. Sergeant Roberts prepared six latent fingerprint cards for the prints he obtained from the shoe box, cup and soda can.  His preparations included identifying, on the back of each fingerprint card, the source of the fingerprints and the date and time that the print was collected.  He then initialed each card to indicate that he had prepared the cards.  After he prepared the cards, Sergeant Roberts placed all six cards in an envelope and forwarded them on to Dorman.  Sergeant Roberts did not have any conversations with Dorman about the source of the fingerprints on the cards and did not advise Dorman that two of the prints came from physical evidence other than the shoe box seized from the Morrow residence. When Dorman received the envelope of prints from Roberts, he did not review the individual prints and assumed that all of the cards contained prints from the shoe box that contained the stolen cash at the Morrow residence.  Thus, the AFIS Submission Form that Dorman sent to the Covington Police Department incorrectly stated that all six of the prints had been lifted from the shoe box.

4

On September 26, 2009, Dawson was arrested by deputies with the Boone County Sheriff's Office.  On October 6, 2009, Dawson appeared in Kenton District Court for a preliminary hearing.  Dorman testified at the hearing as to the facts gathered up to that point in his investigation, including Richard's statement and Eva's identification of Dawson as the robber.  Dorman did not testify about the fingerprints collected by Sergeant Roberts because the information was not available at that time.

On September 23, 2009, Angela Keller, a fingerprint technician for the Covington Police Department, issued a report indicating that one viable print had been obtained from the six latent fingerprint cards that were submitted by Dorman.  However, the available ten-print fingerprint card for Dawson was not useful for comparison purposes.  Keller stated that a new ten-print card would be needed before any comparison with the viable print could be conducted.  Despite the lack of fingerprint evidence, the Kenton District Court determined that probable cause was established and referred the case to the grand jury. The Court set Dawson's bond at $25,000.00.

On November 16, 2009, Keller conducted a second comparison of the latent fingerprint cards that Dorman had previously submitting using a new ten-print card that was obtained after Dawson's arrest.  Keller reported that there was a match between Dawson's left thumb print and the print on the card that she had labeled as "L1."  The report did not specify which of the six submitted cards had been labeled "L1," but it is undisputed that "L1" contained fingerprints obtained from the soda can found at the Baker residence.  When Dorman received Keller's report, however, he still erroneously believed that all of the prints were lifted from the shoe box at the Morrow residence, and Keller did not advise Dorman as to the source of the "L1" print.  Thus, Dorman believed that Keller's report indicated a

5

match between Dawson's prints and the prints lifted from the shoe box.

On December 3, 2009, Dorman testified before the grand jury. Again, he related the facts of the robbery as Richard and Eva had described to him. He told the jury that both Dawson and his brother, Eric Baker, had learned that Richard received a large cash settlement on the day of the robbery. He also testified that Dawson and Baker had stopped by Richard's house several times that day and that Baker organized a drug buy in Latonia that night to get Richard out of the house. Dorman also told the jury that Richard observed two individuals, Baker and a man wearing a gold hooded sweatshirt, run into Baker's house. Dorman stated that Eva Morrow described the robber as wearing a gold hooded sweatshirt. He also told the jury that upon searching the Baker's residence, Baker's wife told police that the sweatshirt belonged to one of Baker's brothers. However, because Dorman was under the mistaken impression that the prints on the "L1" card came from the shoe box instead of the soda can, he testified that there was a match between the fingerprints secured from the shoe box and Dawson's prints. After hearing Dorman's testimony, the grand jury returned an indictment charging Dawson with robbery in the first degree and complicity in violation of K.R.S. §§ 502.020 & 515.020.

Upon the request of Dawson's counsel, the fingerprints were retested around April 2010. Keller's new report stated that the latent fingerprint card previously marked as "L1" was identified on the backside with the following information: "0809LD038 prints from Dr. Pepper Can 8-22-09 @ 2318hrs. JMD (in circle)."[1]  (Doc. # 31-17).  When Dorman was

---

[1] According to Sergeant Roberts and Dorman, Keller's report was inaccurate with respect to the initials on the back of the fingerprint card since no one in the Ludlow Police Department has the initials JMD. Dorman's initials are JLD, and he testified that he did not initial any of the cards. Furthermore, Roberts swore in his affidavit that he initialed each card to indicate that he had prepared the cards.

notified that his testimony regarding the fingerprints was inaccurate he immediately told his supervisor, Lieutenant Colonel Benny Johnson, and the Commonwealth Attorney.  After receiving this information, the Commonwealth Attorney disclosed the mistake regarding the fingerprints to Dawson's attorney and continued with the prosecution.

Dawson's trial was set to begin on June 8, 2010.  As that date approached, Eric Baker, Dawson's co-defendant, plead guilty to robbery in the first degree.  In his plea agreement, Baker affirmed that Dawson had participated with him in the robbery of the Morrow home.  However, the prosecution moved for and obtained a dismissal of the charges against Dawson without prejudice shortly before his criminal trial was to begin. Thereafter, Dawson filed the instant suit against Dorman, his supervisors, Chief Wayne Turner and Assistant Chief Benny Johnson, and the City of Ludlow.

## II.   ANALYSIS

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has satisfied

7

its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

**B.      Section 1983 Claims**

Section 1983 specifically authorizes "any citizen of the United States or other person within the jurisdiction thereof" to pursue "an action at law [or] suit in equity" against every person who under color of state law "causes...the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983; *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002). To state a claim under § 1983, a plaintiff must establish both that the defendant acted under color of state law and deprived him of a federal statutory or constitutional right. *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

### 1.     Fourth Amendment Violations

### i.     Defendant Dorman

Against Defendant Dorman, Plaintiff asserts that he was wrongfully arrested, seized, indicted and incarcerated all in violation of his Fourth Amendment rights.  Specifically, Plaintiff claims that Dorman intentionally mislabeled fingerprint evidence in order to secure the arrest and indictment of Plaintiff.   Moreover, Plaintiff alleges that Dorman falsely testified before the grand jury that Plaintiff's fingerprints were found on the shoe box that contained the cash stolen from the Morrow residence.  For the first time in his response to Defendants' summary judgment motion, Plaintiff also argues that Dorman provided false and misleading information in order to obtain an arrest warrant for the Plaintiff and when Dorman testified at the preliminary hearing.  In response, Dorman claims that Plaintiff's false arrest theory fails because Dorman did not arrest Plaintiff, and the arrest was authorized by a valid arrest warrant.  Furthermore, Defendant argues that probable cause existed for Plaintiff's continued detention and did not "dissolve" upon discovery of the mistaken fingerprint evidence.  Defendant also asserts that the record is void of any evidence that Dorman intentionally fabricated the fingerprint evidence.

### a)     False Arrest

A § 1983 claim for false arrest requires a plaintiff to demonstrate that the arresting officer lacked probable cause to arrest the plaintiff.  *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).  In this case, it is undisputed that Defendant Dorman did not arrest Plaintiff.  Rather, Plaintiff was arrested by an officer of the Boone County Sheriff's Department.  Moreover, Plaintiff was arrested pursuant to an arrest warrant issued by the

9

Kenton District Court.  "An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment, unless the defendant intentionally misled the court or omitted material information in seeking the warrant."  *Nerswick v. CSX Transp., Inc.*, 441 F. App'x 320, 322 (6th Cir. 2011) (citing *Voyticky*, 412 F.3d at 677 n.4).  Therefore, since Dorman was responsible for procuring the warrant  that led to Plaintiff's arrest, Dorman could be held liable for making "material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest."  *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (citing *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999)).

Plaintiff asserts that Dorman provided false and misleading information in order to obtain an arrest warrant by stating that Eva Morrow identified Dawson in a photo-lineup as the person who had robbed her. Plaintiff claims this was false and misleading information because she did not initially identify Plaintiff.  Plaintiff is mistaken.  On the day of the robbery, Officer Dorman presented Ms. Morrow with a lineup of photographs, and she identified two photographs that she believed matched the robber's description, one of which was Plaintiff Dawson.  Later that same day, she was presented with a second lineup, and she positively identified Dawson as the robber.  Thus, Dorman's statement that Ms. Morrow identified Plaintiff in a photo-lineup as the person who had robbed her is not false because she did identify Plaintiff in a photo-lineup as the person who robbed her.  Moreover, his statement is not misleading because Ms. Morrow identified Plaintiff in each of the lineups–there was never a situation where she failed to identify Plaintiff.  Accordingly, Dorman may rely on the judicial finding of probable cause because it was not obtained through false or misleading information.  *See Peet v. City of Detroit*, 502 F.2d 557, 566 (6th

10

Cir. 2007) (citing *Hinchman v. Moore*, 312 F.3d 198, 202-03 (6th Cir. 2002)).

Furthermore, it is clear that probable cause existed at the time of Plaintiff's arrest. Probable cause is a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008) (citation and internal quotations omitted).

The evidence shows that on the day of the robbery, Plaintiff and his step brother, Eric Baker, knew that Richard Morrow had just received a large cash settlement. That same day, Plaintiff and Baker stopped by the Morrow residence several times, and Baker arranged a marijuana sale with Richard for that night in Latonia. However, Baker never showed up for the sale. Ms. Morrow described the robber as a man wearing a gold hoodie. Shortly after the robbery occurred, an eye witness saw Baker and a man wearing a gold hoodie run into Baker's house. A later search of Baker's residence revealed a gold hoodie, which Baker's wife said belonged to one of his brothers. Finally, and most significantly, on the same day as the robbery, Ms. Morrow identified Plaintiff in a photo-lineup as the man who robbed her. Thus, probable cause existed when Dorman submitted his complaint and affidavit in order to obtain a warrant for Plaintiff's arrest. *See Ahlers*, 188 F. 3d at 365 (citations omitted) ("An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation."). Consequently, Plaintiff

11

has not stated a cognizable claim for false arrest against Defendant Dorman.

### b)      Malicious Prosecution

A § 1983 claim for malicious prosecution originates from the deprivation of rights secured by the Fourth Amendment. *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007). Malicious prosecution is "entirely distinct" from false arrest because it remedies detention caused by wrongful institution of the legal process; false arrest remedies detention without legal process. *Wallace v. Kato*, 549 U.S. 384, 390 (2007). Although not specifically identified in his Complaint or response brief, it appears that Plaintiff asserts a claim for malicious prosecution, since he seeks to hold Defendant Dorman liable for conduct that occurred after his arrest. In order to state a claim for malicious prosecution under § 1983, a plaintiff must show that: (1) a prosecution was initiated against the plaintiff and that the defendant participated in the decision; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).[2]

The Sixth Circuit does not require that a plaintiff demonstrate "malice" in order to prevail on a malicious prosecution claim. *Id.* at 309. Fourth Amendment jurisprudence makes clear that the defendant's intent should not be considered. *Id.* at 309-10 ("[T]he reasonableness of a seizure under the Fourth Amendment should be analyzed from an objective perspective, which, even in the context of malicious-prosecution claims, renders

_____

[2] *Sykes* was issued in November 2010, approximately two months after this action was filed. This Court has previously applied the *Sykes* standard to cases that were filed before *Sykes* was issued. *See e.g., Guerra v. Rodriguez*, No. 10-199, 2012 WL 208083 (E.D. Ky. Jan. 12, 2012); *Carter v. Porter*, No. 5:08-CV-246, 2011 WL 778408 (E.D. Ky. Mar. 1, 2011); *Burden v. Paul*, No. 2009-105, 2011 WL 4431819 (E.D. Ky. Sept. 22, 2011).

irrelevant the subjective state of mind of the defendant, whether good faith or ill will." (citations and internal quotations omitted)).

Under the first element, "participated" means that the officer "aids in the decision [to prosecute], as opposed to passively or neutrally participating." *Id.* at 308 n.5. In the present case, Defendant Dorman participated in the decision to prosecute Plaintiff because he submitted the complaint and affidavit to obtain a warrant for Plaintiff's arrest and testified at the preliminary hearing and before the grand jury. Likewise, there is no dispute that Plaintiff suffered a deprivation of liberty as a result of the prosecution and that the proceeding was resolved in his favor when the case was ultimately dismissed. Thus, the only relevant issue for the Court to consider is whether there was a lack of probable cause for the criminal prosecution.

For the reasons stated above, probable cause existed at the time of Plaintiff's arrest. However, Plaintiff claims that, after his arrest, Defendant Dorman fabricated fingerprint evidence and then used that evidence to provide false testimony before the grand jury to secure the indictment of Plaintiff. It is well established that police officers cannot, in good faith, rely on a judicial determination of probable cause when such determination was based on an officer's own material misrepresentations to the court. *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) (citing *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989)). In order to establish that an officer acted in an objectively unreasonable manner in continuing the plaintiff's detention, the plaintiff must prove that the officer "(1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Id.* (citations omitted). Likewise, the fabrication of evidence to create probable

cause would also be in violation of a suspect's Fourth Amendment rights. *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999).

In the instant case, Plaintiff has presented no evidence that Defendant Dorman stated a deliberate falsehood, showed reckless disregard for the truth, or intentionally fabricated the fingerprint evidence in order to secure the indictment of Plaintiff. The record reveals that Sergeant Roberts prepared six latent fingerprint cards for the prints collected from the shoe box, soda can, and cup and put those in an envelope for Dorman. Dorman, without opening the envelope and inspecting the cards, assumed that the fingerprints were all collected from the shoe box. Thus, the submission form that he sent to the Covington Police Department incorrectly stated that all six of the prints had been lifted from the shoe box. At worst, Plaintiff has established that Dorman was negligent in how he submitted the prints, which is insufficient to establish liability under § 1983. *See Smoak v. Hall*, 460 F.3d 768, 785 (6th Cir. 2006) (negligence is insufficient to support a § 1983 claim).

Dorman's testimony to this effect is not inconsistent with any other evidence of record. None of the Ludlow Police Department reports indicate where the prints were lifted from. Roberts also testified that he never had any conversations with Dorman regarding the source of the fingerprints. Furthermore, if Dorman's intent was to fabricate fingerprint evidence in order to obtain an indictment, as Plaintiff suggests, it seems highly unlikely that Dorman would not also falsify the actual latent fingerprint cards, given that each card identified where the print was taken from. Indeed, the only matching latent print stated on the backside of the card that it was lifted from the "Dr. Pepper Can." (Doc. # 31-17). Had Dorman intentionally fabricated the evidence, he could have easily changed the card to state that it was lifted from the shoe box instead of the soda can. Accordingly, there is

14

simply no evidence to support Plaintiff's theory that Dorman intentionally fabricated the fingerprint evidence.

Furthermore, the probable cause herein did not "dissolve" upon the discovery of the mistaken fingerprint evidence.  Plaintiff cites *Albright v. Oliver*, 510 U.S. 266 (1994) and *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) for the proposition that "a determination of probable cause does not guarantee escape for those on the side of the prosecution from later wrongdoing."  In actuality, the cases state that if a police officer fabricates evidence, *and that evidence was the basis for a probable cause determination*, the continued detention of an arrestee would then violate the Fourth Amendment.  *See Gregory*, 444 F.3d at 758.  Plaintiff's reliance on these cases is misplaced.

The mistaken fingerprint evidence was not the sole basis for the probable cause determination in this case.  As discussed more fully above, probable cause existed at the time of Plaintiff's arrest and was not based on any false or misleading information.  The evidence establishes that on the day of the robbery, Plaintiff and his step brother, Eric Baker, knew that Richard Morrow had just received a large cash settlement.  Ms. Morrow described the robber as a man wearing a gold hoodie.  Shortly after the robbery occurred, an eye witness saw Baker and a man wearing a gold hoodie run into Baker's house.  A later search of Baker's residence revealed a gold hoodie, which Baker's wife said belonged to one of his brothers.  Finally, on the same day as the robbery, Ms. Morrow identified Plaintiff in a photo-lineup as the robber.  The mistaken fingerprint evidence, thus, had no effect on the prior probable cause determination.  Accordingly, since probable cause existed not only for his arrest, but also for Plaintiff's continued criminal prosecution, Plaintiff

15

cannot maintain a malicious prosecution claim against Defendant Dorman.

### ii.   Defendants Turner and Johnson

Plaintiff also alleges that Defendants Turner and Johnson violated his Fourth Amendment rights.  Since Plaintiff has presented no evidence that either Turner or Johnson participated in the investigation or prosecution of Plaintiff, it appears that any § 1983 claim against them would be as supervisors only.  It is well-settled that government officials may not be held liable for the unconstitutional conduct of their subordinates on the basis of *respondeat superior*.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (§ 1983 claims must be based "on more than respondeat superior, or the right to control employees.").  Rather, a plaintiff must establish that the official encouraged the specific alleged misconduct or somehow directly participated in it.  *Petty v. Cnty. of Franklin*, 478 F.3d 341, 349 (6th Cir. 2007).  "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *Id.*  Furthermore, supervisory liability cannot attach where the allegation is simply a failure to act.  *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).

As stated, there was no constitutional deprivation by Defendant Dorman.  However, even assuming that Defendant Dorman's actions constituted unconstitutional conduct, Plaintiff has not presented any proof that Defendants Turner or Johnson encouraged or participated in the conduct.  Plaintiff merely alleges that Turner and Johnson failed to act by negligently supervising Defendant Dorman.  For the reasons stated above, such allegations are insufficient to state a § 1983 for supervisor liability. Furthermore, Turner and Johnson would be entitled to qualified immunity because there is no clearly established law

16

indicating that a supervisor can be held individually liable for the actions of his subordinates without proof that he ordered, participated in, or actively condoned the constitutional violations. *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Consequently, Plaintiff's Fourth Amendment claims against Defendants Turner and Johnson are dismissed.

### iii.    Municipal Liability

Plaintiff asserts that the City's failure to adequately train its police officers in the handling of fingerprint evidence constitutes deliberate indifference to the rights of such persons. The liability of local government entities cannot be premised on a theory of *respondeat superior*. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996). Therefore, a governmental entity can only be held liable on the basis of its own conduct. *Id.* at 507. To prevail on a § 1983 claim against a municipality, a plaintiff must establish: (1) that he suffered a deprivation of a constitutionally protected interest; and (2) the alleged deprivation was caused by an official policy, custom, or usage of the municipality. *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Because Defendants Dorman, Turner and Johnson did not violate Dawson's Fourth Amendment rights, Plaintiff cannot rely on Defendants' conduct to also establish a claim of municipal liability against the City of Ludlow. *See id.* However, the Court assumes *arguendo* that Defendants violated Dawson's Fourth Amendment rights and, therefore, will address Plaintiff's claim against the City of Ludlow on the merits.

Under § 1983, a municipality can only be held liable if the plaintiff establishes that the injury suffered was a direct result of the city's official policy or custom. *Id.* at 694-95; *see also Heyerman v. Cnty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010)) ("Municipal liability only attaches

17

where a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights.").  A claim based on inadequate police training only satisfies § 1983 liability where (1) the training program at issue is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the municipality's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury.  *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *City of Canton*, 489 U.S. at 390.  Instead, the focus should be on the adequacy of the training program and whether "the identified deficiency in a city's training program [is] closely related to the ultimate injury."  *Id.* at 391.  Furthermore, it is not enough to argue that the City should have required "better or more training," because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program ... ."  *Id.*

In the present case, Plaintiff has presented no evidence that the training of the Ludlow Police Department officers in the handling of fingerprint evidence is inadequate.  Indeed, Plaintiff has not produced any records or testimony with respect to the nature and type of training that the City provides its officers in this regard.  He merely claims that the City's policy of placing all fingerprint evidence from the same case into one envelope is inadequate, because, in this case, a mistake was made.  However, an inadvertent mistake certainly does not indicate that the City's training program is inadequate.  Furthermore, the Court finds Plaintiff's argument in this respect disingenuous, given his previous contention

18

that Defendant Dorman *intentionally* mislabeled the fingerprint evidence in order to secure the indictment of Plaintiff.  Regardless of whether Plaintiff believes the act was intentional or a mistake, he has failed to establish that any alleged constitutional violation was caused by an official policy, custom, or usage of the City.

### 2.      Eighth Amendment Claims

Plaintiff alleges that Defendants violated his rights under the Eighth Amendment, but does not specify the manner in which his rights were violated.  Because it prohibits cruel and unusual punishments, the Eighth Amendment only applies to those incarcerated after conviction.  *See Graham v. Connor*, 490 U.S. 386, 398-99 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)) ("the less protective Eighth Amendment standard applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'"); *see also Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 221 (6th Cir. 2007).  Since Dawson's prosecution was not fully carried out, and he was not convicted of the robbery, he cannot state a cognizable Eighth Amendment claim.

### 3.      Fourteenth Amendment Claims

Plaintiff also claims that Defendants violated his Fourteenth Amendment rights, yet, again, does not specify the manner in which his rights were violated.  In fact, Plaintiff has failed to raise any additional facts other than those relating to his Fourth Amendment false arrest and malicious prosecution claims.  The Supreme Court has held that, where the Fourth Amendment provides protection against the conduct alleged, a claim under the Due Process Clause of the Fourteenth Amendment for the same conduct is precluded.  *Albright*

v. Oliver, 510 U.S. 266, 273 (1994); see also Radvansky v. City of Olmstead Falls, 395 F.3d 291, 313 (6th Cir. 2005) ("Thus, because the Due Process Clause of the Fourteenth Amendment does not require any additional procedures beyond those mandated by the Fourth Amendment, we conclude that the [defendants] are entitled to judgment on [the due process claim] as a matter of law."). Accordingly, Plaintiff's Fourteenth Amendment due process claims are hereby dismissed.

## C.   State Law Claims

In addition to alleging federal constitutional injuries, Plaintiff asserts Kentucky state law claims of negligent hiring, retention and supervision. However, it is unnecessary for the Court to address the merits of summary judgment with respect to the state law claims. "Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. If the federal claims are dismissed before trial, the state claims generally should be dismissed as well." Brooks v. Rothe, 577 F.3d 701, 709 (6th Cir. 2009) (quoting Wojnicz v. Davis, 80 F. App'x 382, 384-85 (6th Cir. 2003)) (internal quotations omitted); see, e.g., Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 210 (6th Cir. 2004); Musson Theatrical v. Fed. Express Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.").

Because the Court's jurisdiction over Plaintiff's state law claims was supplemental under 28 U.S.C. § 1367©, and Plaintiff's federal claims have now been dismissed, the Court declines to continue exercising supplemental jurisdiction over the state law claims

in this matter.  *See* 28 U.S.C. § 1367(c)(3).

### III.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)     Defendants' Motion for Summary Judgment (Doc. # 31) is hereby
**GRANTED**;

(2)     Plaintiff's federal claims are hereby **DISMISSED WITH PREJUDICE**;

(3)     Plaintiff's state law claims are hereby **DISMISSED WITHOUT PREJUDICE**;
and

(4)     This case is hereby **STRICKEN** from the active docket of this Court.

This 29th day of August, 2012.



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\Opinions\Covington\2010\10-208 MOO granting MSJ.wpd

21